Filed 6/25/15  P. v. Rosas CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MANUEL DE JESUS ROSAS,<br><br>    Defendant and Appellant. | H038879<br>(Santa Cruz County<br>Super. Ct. No. WF00933)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 2, 2015, be modified in the following particulars:

1.  On page 25, line 3 of the third full paragraph, the phrase "a detailed cross-examination of Lopez regarding his prior criminality and drug addiction" is replaced with the phrase "a detailed cross-examination of Detective Chappell regarding Lopez's prior criminality and drug addiction" so that the sentence reads as follows:

Prior to the prosecution's redirect examination of Detective Chappell, the prosecutor argued that the defense had "open[ed] the door" to the introduction of more details about Lopez's statement by conducting a detailed cross-examination of Detective Chappell regarding Lopez's prior criminality and drug addiction.

2.  On page 31, following the second sentence of the fourth full paragraph, the following sentence is added:

Defendant also claims the trial court erred by permitting the gang experts to testify that Lopez was credible.

3.  On page 40, the following is added after the second full paragraph:

### 11.  Opinions About Lopez's Credibility

Defendant also contends the trial court erred by allowing the gang experts to testify that they believed Lopez was credible.  "The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful.  [Citations.]"  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)

Defendant did not object when, on direct examination by the prosecutor, Sergeant Montalbo testified that he considered the "information coming from Mr. Lopez credible."  Thus any challenge to that testimony was forfeited.  (See *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [" 'questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal' "]; *People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1434 [claim that hypothetical questions asked of gang expert were beyond the proper scope of expert testimony was forfeited for failure to object on such grounds].)

Additionally, defendant himself elicited Detective Chappell's opinion about Lopez's credibility.  Defendant asked Detective Chappell if "by making some of these statements [Lopez] puts himself in danger and therefore it carries some credibility[?]"  Detective Chappell replied, "He definitely puts himself in danger" and agreed when defense counsel asked, "And therefore it carries credibility, does it not?"  Since "the testimony about which defendant now complains was elicited by his own counsel," "any

2

error was invited, and defendant may not challenge that error on appeal." (*People v. Williams* (2009) 170 Cal.App.4th 587, 620.)

4.  On page 40, following the insertion of the material in item 3 above, subheading 11 is changed to subheading 12, so that the subheading appears as follows:

**12.    Prejudice**

There is no change in judgment.

The petition for rehearing is denied.

 

_____\
ELIA, ACTING P.J.

 

_____\
BAMATTRE-MANOUKIAN, J.

 

_____\
MIHARA, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> MANUEL DE JESUS ROSAS, <br><br>     Defendant and Appellant. | H038879 <br> (Santa Cruz County <br>  Super. Ct. No. WF00933) |

## I.     INTRODUCTION

Defendant Manuel de Jesus Rosas appeals after a jury convicted him of premeditated and deliberate first degree murder (Pen. Code, § 187, subd. (a)**[1]**; count 1), attempted murder (§§ 664/187, subd. (a); count 2), and participation in a criminal street gang (§ 186.22, subd. (a); count 3), with findings that the murder and attempted murder were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  The jury also found that in the commission of the murder and attempted murder, defendant and/or a principal personally and intentionally discharged a firearm that caused great bodily injury or death (§ 12022.53, subds. (d), (e)(1)).  The trial court sentenced defendant to a prison term of 94 years 8 months to life.

---

**[1]** All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends the trial court erred by permitting gang experts to testify that Marco Lopez, a non-testifying gang member, said that defendant admitted that he was the shooter and that the shooting was part of a gang war. Defendant claims the gang expert testimony violated his Sixth Amendment right of confrontation as well as state evidentiary rules, including Evidence Code section 352. Defendant also contends the trial court erred by permitting the gang experts to offer opinions based on facts the experts themselves introduced. Additionally, defendant contends the trial court erred by admitting an out-of-court identification of defendant by the attempted murder victim. Finally, defendant contends the trial court erred by denying his motion for a mistrial after the jury accidentally viewed a video depicting the murder victim's dead body.

We agree with defendant that the trial court erred by allowing the gang experts to testify about the statements made by a non-testifying gang member. We find that the error does not require reversal of defendant's offenses, the gang allegation, or the allegations that a principal personally and intentionally discharged a firearm that caused great bodily injury or death. However, we will strike the jury's findings that defendant personally and intentionally discharged a firearm that caused great bodily injury or death, and we will order the gang allegation stayed. We find no merit to defendant's remaining contentions.

## II. BACKGROUND

On May 13, 2005, Wayne Minten and Dante A. were shot on Palm Avenue in Watsonville. Minten died; Dante A. survived. Dante A. saw the shots fired from a burgundy GMC Yukon, and he believed the driver had fired the shots. Other witnesses also saw a burgundy sports utility vehicle (SUV), like the one defendant often drove, around the scene and time of the shooting. The prosecution's theory was that defendant was driving the Yukon and that he shot Minten and Dante A. by reaching over the passenger's seat and firing out the front passenger window. The prosecution alternatively

2

argued that even if defendant was not the shooter, he had been the driver and was guilty of the charges based on an aiding and abetting theory.

### A. Defendant's Prior Arrest in a Burgundy Yukon

About three months before the Minten/Dante A. shooting, on February 23, 2005, Officer Eric Montalbo contacted defendant, who was sitting in the driver's seat of a burgundy Yukon. Officer Montalbo had seen defendant driving the burgundy Yukon on four or five prior occasions. A loaded .38 Special revolver was on the front passenger seat of the vehicle.

Based on prior contacts with defendant, Officer Montalbo believed defendant was involved with a Norteño gang. Officer Montalbo recognized defendant's three rear passengers as members of the City Hall Watsonville subset of the Norteño gang. Officer Montalbo observed several tattoos on defendant: "City Hall Soldier" on his neck, "X4" on his neck, and four dots on his left hand. Officer Montalbo did not see a teardrop tattoo on defendant's face at that time.

Defendant was later charged with carrying a firearm in a vehicle in violation of former section 12025. He was released from custody after a $5,000 bail bond was posted by a family friend.

### B. The Shooting of Minten and Dante A.

In May of 2005, Dante A. was living on Palm Avenue in Watsonville with Damien Duron and her son, Minten. Dante A. was 17 years old and Minten was 18 years old. Minten had been hanging out with people who appeared to be in the gang lifestyle, and he told Dante A. that he needed to "watch out" for City Hall Watsonville. Dante A. had participated in some gang activities with Minten: throwing gang signs, getting into fights, and selling marijuana. According to Luis Juarez, one of Minten's best friends, Minten was not actually involved in a gang. Minten's mother, Duron, also did not think Minten or most of his friends were involved in gangs.

3

On May 13, 2005, Dante A. and Minten hung out with some of Minten's friends at a school near their house. Dante A. began walking home, with Minten riding a bike next to him. On several occasions over the previous few weeks, Dante A. had noticed a burgundy Yukon with tinted rear windows. He saw the burgundy Yukon again as he and Minten were on their way home from the school. The Yukon then turned around. Dante A. got a weird feeling, so he watched the Yukon and looked inside. The Yukon was traveling only about five miles per hour or slower.

Dante A. could clearly see the Yukon's driver, who looked straight at him. The driver was heavyset, with thick eyebrows or tattoos over his eyebrows, and a little bit of facial hair—possibly a light mustache. The driver had short hair and wore a red shirt.

After the Yukon turned around, it pulled up beside Minten. Dante A. saw the barrel of a gun come out of, or up to, the front passenger window. He then saw the gun pulled back inside the vehicle. Someone said, "What, what, what's up mother---." He then heard two shots, which were fired from inside the car. Dante A. ran towards Minten but was shot at himself, so he dove to the ground.

Dante A. believed that the driver was the shooter. Dante A. saw the front passenger of the car holding a big gun after the shots were fired, but he did not think that the front passenger had actually fired the gun. The front passenger was skinny, with short hair, normal eyebrows, a white shirt, and a tattoo on his arm. He looked like someone named Gabe, with whom Dante A. had fought the previous week.

Police responded to the scene of the shooting—located at 505 Palm Avenue—at about 8:30 p.m. Officer Steven Nakamoto arrived first. He attended to Minten, who was lying on the sidewalk and who was later pronounced dead at the scene. Another officer arrived and attended to Dante A., who was lying on the grass and complaining of pain in his groin.

When an officer asked Dante A., "who did this to you," Dante A. replied, "I don't know." Dante A. did not fully answer questions from the police because he was afraid he

4

might be killed for cooperating, but he did describe the burgundy SUV. Dante A. told the police that Gabe, the person he had previously fought with, could have been in the car. He also told the police that Michael Harrington was involved, although he later testified that Harrington only resembled the driver.

Bullets were recovered from the sidewalk near Minten's body, the gutter in front of 505 Palm Avenue, and the front porch of 505 Palm Avenue. Bullet fragments were found in the area as well, but no casings were found. The bullets were .38 caliber, and they were all fired from the same gun.

### C.     Witness Testimony about Seeing a Burgundy SUV on May 13, 2005

Nancy Gutierrez Fernandez was on her back porch when she saw a burgundy SUV speeding down the alley next to her house. The vehicle headed east on Palm Avenue. About a minute later, she heard gunshots. She then saw the vehicle speeding away.

Julio Mendez and his girlfriend were driving on Palm Avenue. While stopped at a stop sign, they heard a sound like firecrackers. They continued driving, then saw a vehicle coming towards them, fast. They continued driving until they saw a person laying face-down on the sidewalk. At that point, Mendez stopped the car and called 911. Mendez thought that the vehicle was a Yukon or a Suburban. He initially thought that the vehicle was tan or gray, because of the lighting, but he later described it as red.

Sylvia Mendez was outside her home on Hill Street near the intersection with Palm Avenue. She heard screeching tires and turned towards the intersection, where she saw a burgundy SUV driving by "really fast." She heard sirens three or four minutes later.

Janet Rackley lived on the 400 block of Palm Avenue. She heard gunshots from inside her house and heard a vehicle accelerating. She went to a window and saw what appeared to be an SUV driving fast.

5

Dennis Maitoza, his son, and a friend were at an intersection around Palm Avenue. Maitoza called 911 after seeing the SUV speeding and nearly colliding with his car. He reported that one of the vehicle's brake lights was out.

Maitoza's son, then 13 years old, reported that a burgundy SUV cut them off. The SUV "kind of skidded out, swerved," and went down Palm Avenue. Shortly afterwards, he heard a sound like firecrackers. He then heard the revving of an engine and saw the same burgundy SUV come down California Street. The SUV stopped at an intersection and turned right.

Jacqueline Ramirez (formerly Hernandez) lived on Hill Street at the intersection with Palm Avenue. She was friends with defendant's sister, Carmen Rosas,[2] and she knew that defendant and Carmen both drove a burgundy SUV. Ramirez saw "the SUV" driving recklessly on her street. The vehicle came from Palm Avenue and turned onto Hill Street, where it almost hit her mother's car. She saw "a couple of guys" in the vehicle but could not see any of their faces. Both the driver and front passenger were Hispanic males, and there were two Hispanic males in the back. The front windows were rolled down, and Ramirez thought she recognized defendant in the driver's seat. The driver was dark-skinned and "kind of bald," like defendant. She later told police she thought defendant could have been the front passenger. Ramirez called Carmen, saying she'd seen the Rosas's SUV driving by. Carmen told her that the SUV was at the Rosas's house and that she had just dropped defendant off at the cemetery, but Ramirez did not believe her.

Some time after the shooting, Kathryn Walters contacted the police because she had seen a vehicle that matched the description of the one involved in the shooting. Walters saw the vehicle "going in the out" of a bank parking lot near the farmer's market.

---

[2] Since defendant and his sister have the same surname, we will refer to Carmen Rosas by her first name for purposes of clarity and not out of disrespect.

There were two people in the car. Walters was closer to the passenger than the driver. Walters was later shown a photo lineup that included defendant's photo. Walters identified two people as looking similar to the driver, but she did not select defendant. Walters also identified a photograph of the passenger, but the photo was one that had been placed in the lineup randomly.

### D. Impounding of the Yukon and Search of Defendant's Home

After hearing that a burgundy SUV was possibly involved in the Minten homicide, Officer Montalbo believed the vehicle description was consistent with defendant's vehicle. Officer Montalbo did not know of any other Watsonville gang member who drove a burgundy Yukon. Police put out a "BOL" (be on the lookout) for defendant's vehicle.

Two days after the shooting, on May 15, 2005, Officer William Morales stopped a burgundy GMC Yukon being driven by defendant's sister, Carmen. A rear taillight of the vehicle was out. Officer Morales issued a citation, then had the vehicle towed to the police department.

Nancy Gutierrez Fernandez viewed the Yukon at the police department. It looked like the vehicle she had seen on the night of the shooting, but she could not be sure. Julio Mendez also could not be sure it was the same vehicle. Mendez worried that if he identified a vehicle, he would get into trouble. He "didn't want to be involved" in the case out of concern about gangs. Mendez believed that Minten's friends were Norteños.

Sylvia Mendez saw the vehicle at the police department; it was similar to or the same one that she had seen on the night of the shooting. When Dennis Maitoza saw the Yukon at the police department a few days after the shooting, he said he recognized it. His son said that the Yukon was similar to the vehicle he had seen.

Jacqueline Ramirez identified the Yukon at the police station as the same one she had seen on the night of the shooting.[3]

During a search of the Yukon, police found defendant's driver's license, paperwork showing defendant's appointments for tattoo removal, and a receipt for the purchase of a bag of ice from a Watsonville supermarket at about 4:00 p.m. on May 13, 2005. There was a flat tire in the rear cargo space of the Yukon.

Gunshot residue testing was performed on the Yukon, which appeared to have been recently cleaned. Gunshot residue particles were found in the area under the front passenger window, on the front console, in the rear right passenger door area, and in the headliner of the middle seat. The presence of gunshot residue in these areas indicated that a firearm was discharged inside the vehicle or into the vehicle. Firing a gun from the driver's seat through the front passenger window would leave gunshot residue and bullet casings in the vehicle.

Defendant's home was searched on May 20, 2005. In his bedroom, police found gang indicia as well as a receipt for ammunition, which was dated May 10, 2005 – three days before the shooting. The receipt showed the purchase of three types of ammunition, including ammunition for a .38 Special. The gang indicia included a photograph of people throwing gang signs and a photograph of defendant throwing a gang sign.

### E. Defendant's Flight

After the Yukon was impounded on May 15, 2005, Carmen told defendant that the police wanted to speak with him. Within a few days, defendant left. Defendant's

---

[3] At trial, Ramirez testified that the Rosas's SUV had a soccer ball or baseball sticker on the passenger side or on the back window. However, there was no such sticker on the car she viewed. According to Officer Monica Herrera Gonzalez, Ramirez did not refer to a sticker, but to an area of dust left by the rear windshield wiper. She attributed Ramirez's trial testimony to a mistake in the transcript of her interview at the police station, in which she said "clean space" or "open space," not "baseball."

mother, Lillian Zequeira, did not hear from him until about a month later, when he called from Mexico. Defendant thereafter worked in Wisconsin and South Carolina.

In January of 2006, an employee of the bail bond company tried to find defendant. The employee went to defendant's last known address. Defendant's mother said defendant had not been home since he was wanted for questioning as a murder suspect. She believed he was in Mexico.

In September of 2009, police learned that defendant was in custody in South Carolina, and they arrested him there. Police had documented defendant's gang tattoos in 2004; they included "Watson Locos" above his eyes and "X4" on his neck. By the time of his arrest in 2009, defendant had new gang tattoos, including a teardrop near his left eye. The most common meaning of a teardrop tattoo is "that you've killed somebody." A teardrop tattoo can also symbolize a person's first stint in prison or the loss of a family member, although typically those teardrops would just be outlined, not filled in.

### F. Testimony of Defendant's Mother and Sister

Zequeira, defendant's mother, testified under a grant of immunity. In May of 2005, she had three vehicles: a blue van, the burgundy Yukon, and a white Nissan. She, defendant, and Carmen all drove the Yukon. However, after defendant's arrest in February of 2005, defendant hardly ever drove the Yukon, because the police would stop him.

On the afternoon of May 13, 2005, Zequeira left for work at about 1 p.m. and Carmen left for work in the morning. Defendant was at home during the day, taking care of the children.[4] Zequeira worked at the farmer's market until about 7:30 p.m. Carmen arrived to work with Zequeira at about 3:00 p.m. Zequeira drove the blue van, and Carmen drove the Nissan.

---

[4] The children included Carmen's one-year-old son and defendant and Carmen's half siblings, who ranged in age from three to nine.

Zequeira arrived home at about 7:30 p.m. According to Zequeira, the Yukon was in the garage. Zequeira went upstairs until about 8:30 p.m. When Zequeira came downstairs, she heard Carmen answer the telephone and say that she had just taken defendant to the cemetery.

Carmen arrived home at about 7:15 p.m. Carmen testified that she later drove defendant to the cemetery in the Nissan. Defendant's closest friend, Isaac Guzman, had been murdered in December of 2004, and defendant went to his grave nearly every day. However, when interviewed by the police, Carmen had claimed to have been driving the Yukon on the night of the shooting. She claimed she had been at Target from 8:00 p.m. to 9:00 p.m. After officers told Carmen that they would obtain surveillance video from Target, Carmen admitted she had not gone to Target; she had given defendant a ride to the cemetery between 8:00 p.m. and 9:00 p.m.

According to Zequeira, they cleaned the Yukon on a weekly basis at the car wash. According to Carmen, in 2005, defendant's tattoos included a teardrop. He was not involved in gangs at that time and was having his tattoos removed. He did remain friends with gang members, however.

### G. *Identification of Defendant*

After learning that defendant drove a vehicle similar to the one seen around the time of the shooting, Officer Monica Herrera Gonzalez put defendant's photograph into a photo lineup. She showed that photo lineup and a second photo lineup to Dante A. on May 16, 2005. Associates of defendant were in the lineups as well.

Dante A. crossed out the person in the number two position and circled "unknown" on the first photo lineup, which contained defendant's photograph in the number one position. He also circled "unknown" on the second lineup. Dante A. indicated that he "didn't want to have anything to do with" the police. When shown the Yukon, Dante A. said the vehicle was very similar and "could possibly" be the one involved in the shooting, but he was not 100 percent sure.

10

At some point after the shooting, Duron (Minten's mother) showed Dante A. a photo of defendant from the newspaper. Dante A. identified defendant as the driver. However, he did not tell the police about recognizing defendant because he was scared.

In September of 2009, after the police located defendant in South Carolina, Dante A. met with the police. He told the police that Duron had shown him a photo of defendant and that he had identified defendant as the driver. Duron gave the police a copy of the newspaper, which was dated August 17, 2005. The article accompanying defendant's photograph was titled, "Police search for fugitive." The article stated that the police wanted to talk to defendant regarding the Minten homicide.

### H. Gang Evidence

Detective Morgan Chappell and Officer Montalbo both testified as gang experts.

#### 1. Testimony About Norteño Gangs

Detective Chappell described the signs and symbols of the Norteño gang: red, the number 14, the Huelga bird, and the letter N or the pronunciation "ene." He listed some of the Norteño subsets in Watsonville: Northside Chicos (Northside), Watsonville Varrio Norte, Clifford Manor Locos, City Hall Watsonville (City Hall), and Varrio Green Valley. The Watsonville Varrio Norte subset was aligned with Northside. In general, the rules of the Norteño gang prohibit killing other Norteños.

To become a gang member, a person must be jumped in, crimed in, or blessed in. A gang associate is someone who hangs out with gang members but has not yet been jumped in. Gang members adhere closely to a "code of silence," meaning they will not cooperate with law enforcement, even if a rival gang has attacked a fellow gang member.

Regarding the City Hall subset, the primary activities are robberies, burglaries, shootings, stabbings, gang assaults, and murders. In 2000, City Hall gang member Ismael Farias committed a vehicle burglary. In 2003, City Hall gang member Richard Bettencourt committed a robbery, and he was subsequently convicted of robbery with a gang enhancement.

11

## 2. Defendant's Gang Membership

On May 6, 2005, a week before the Minten/Dante A. shooting, police went to defendant's residence to do a probation search and serve an arrest warrant. There was no response when the officers knocked and rang the doorbell, so they entered through a window. They found defendant and four others hiding in the house. The four others included two City Hall gang members (Farias and Emmanuel Rodriguez), one City Hall associate (Dennis Moreno), and one other person (Jaime Rodriguez) whose gang association/membership was unknown. A week before that incident, on April 30, 2005, defendant had been in a vehicle with City Hall gang members Manual Perez and Johnny Martinez. Moreno had committed a vehicle burglary in February of 2004, Perez had committed a robbery in 1997, and Martinez had committed a vehicle theft in 2001.

When defendant was found in his Yukon with a loaded firearm on February 23, 2005, City Hall gang members Valentine Cornejo and Luis Hernandez were passengers. Cornejo committed a vehicle burglary a month later. Hernandez had tattoos indicating his affiliation with the City Hall gang.

On March 3, 2005, an officer driving by a City Hall gang member's house saw defendant, Cornejo, Hernandez, and Oligario Gonzalez going inside. A probation search of that residence revealed a shell casing in the back yard.

On December 9, 2004, gang members were seen running from a fight. They included defendant, Cornejo, Hernandez, and Rufo Ayala. Defendant had a switchblade in his possession and he challenged an officer to a fight.

On October 9, 2004, police were called to defendant's home in response to a report of shots being fired. Police searched the home. City Hall gang members Moreno, Hernandez, and Guzman were present.

On October 17, 2002, police had been called to a large fight. Defendant was there, and when the police attempted to detain him, he shouted, "[P]uro Norte." Defendant told

12

the police he had been a Norteño since age nine. A search of his bedroom revealed 41 rounds of .22-caliber ammunition.

Another October 2002 police contact with defendant followed a citizen's report of him brandishing a firearm. Defendant had a knife in his pocket when he was searched, and he said he used it for protection from "scraps." Defendant also admitted having a BB gun.

Another police contact with defendant occurred still earlier in 2002. Defendant had been wearing gang attire, and he admitted he was a Norteño.

### 3. The War Between Northside/Watsonville Varrio Norte and City Hall

On September 24, 2004, Watsonville Varrio Norte gang member Mario Lozano was shot, but not killed. The police suspected Guzman, a City Hall gang member, of committing the shooting. A few months later, in early December of 2004, Guzman was murdered—he was brutally stabbed in broad daylight. The police suspected Lozano of committing the crime, since Lozano was seen running from the scene. However, Lozano was never found.

The night after Guzman's murder, Northside gang member Brian Smith was shot. Ballistics tests indicated that the same gun was used in the Smith and Minten/Dante A. shootings. Detective Chappell testified that it is common for gangs to have a "hood gun," which is owned by the gang and kept at the home of someone who is not on searchable parole or probation.

On June 16, 2005, Officer Montalbo arrested Marco Lopez, a City Hall gang member. In a post-arrest interview, Lopez talked to Officer Montalbo "about the war that was . . . going on" between Northside and City Hall. Officer Montalbo had previously heard, from contacts on the street, that "there was a problem between Northside Watsonville and City Hall Watsonville" because of the Guzman homicide. Lopez, who had been arrested for carrying a gun, said he had armed himself because he was afraid of

13

retaliation by Northside following the Minten shooting.  Lopez said he believed Minten was a Northside associate.

Lopez told Officer Montalbo about a gang meeting he had attended shortly after the Minten shooting, and he identified the other gang members at the meeting, which he described as the "junta" of City Hall.  Lopez stated that defendant was present at the meeting.  Defendant had said "that he had shot and killed Wayne Minten, and not only that had he shot and killed him, but he wanted Marco Lopez to kill the surviving victim [Dante A.] because he was afraid that [Dante A.] would testify against him."

According to Detective Chappell, it is "very, very rare and very, very dangerous" for a gang member to name someone in his own gang as having admitted to a killing.  A gang member would not brag about committing a crime that he did not commit, especially since most gang crimes are done with other gang members, so that "if you were lying about it the other people that were there would surely know."

Detective Chappell also spoke to Lopez, who repeated the information he had provided to Officer Montalbo.  Detective Chappell asked Lopez for his thoughts on why defendant had a teardrop tattoo.  Lopez said he believed it was because defendant "had done the murder."

### 4.    Minten's Gang Association/Membership

Detective Chappell believed that Minten was a Norteño gang member, but he did not know if Minten had been jumped in to a specific subset.  Detective Chappell based this opinion on the fact that gang writings had been found in Minten's bedroom; Minten's prior police contacts, during which he wore red clothing; Lopez's statement that Minten was a Northside associate; and Julio Mendez's statement describing Minten's friends.  In addition, after Minten's death, a Norteño gang member was caught writing "RIP Wayne" in graffiti, which indicates Minten was a Norteño.

14

Officer Montalbo had contacts with Minten for a few years before the shooting. He knew that Minten "hung out and associated with members of WVN, Watsonville Varrio Norte, and Northside Watsonville."

### 5. Detective Chappell's Opinions

Detective Chappell opined that defendant was an active participant in a criminal street gang on May 13, 2005. He based that opinion on defendant's prior police contacts, gang tattoos, association with other City Hall gang members, and admissions of gang membership. Detective Chappell further opined that defendant knew that City Hall had engaged in a pattern of criminal gang activity. He observed that defendant had committed crimes with other gang members and that defendant was "constantly" associating with gang members who were committing crimes. Additionally, Detective Chappell opined that as of May 13, 2005, defendant had promoted felonious criminal conduct by "the Nortenos and the City Hall Watson criminal street gang." He based that opinion on the fact that defendant had been "shouting it out in the streets to police officers" and "nonverbally" promoting the gang "with his clothing, with his tattoos, with his street fights."

Detective Chappell was asked to assume the following facts: Lozano, a Watsonville Varrio Norte gang member and Northside gang associate, was shot on September 24, 2004. Guzman, a City Hall gang member, was suspected of that shooting. On December 3, 2004, Guzman was stabbed to death by Lozano. On December 4, 2004, extra police were on patrol because of expected retaliation, and on that date Northside gang member Smith was shot. On May 13, 2005, Northside associate Minten was shot with the same gun used in the Smith shooting. On June 16, 2005, City Hall gang member Lopez was arrested and stated that he was carrying a gun in anticipation that Northside would retaliate for the Minten murder, that Minten was considered a Northside associate, and that City Hall had killed Minten as retaliation for the Guzman murder. Based on that

15

factual scenario, Detective Chappell opined that the Minten murder would benefit the City Hall gang.

### 6. Officer Montalbo's Opinion

Officer Montalbo testified that he believed the Minten murder was "gang related." He based his opinion on the fact that, prior to the Minten/Dante A. shooting, Guzman had been killed by a Northside gang member, and his knowledge of "how these gangs operate"—i.e. that "there would be some type of retaliation from City Hall Watsonville." In addition, "it was a driveby shooting, which is very consistent with our Norteno gang members." Further, he had been "making contacts with gang members" around the time of the Minten/Dante A. shooting, and based on those contacts, he knew "there was a problem between Northside Watsonville and City Hall Watsonville because of the homicide of Isaac Guzman."

### I. *Defense Witnesses*

The defense theory was that the police had jumped to the conclusion that defendant was the shooter based on the fact that his car was similar to the burgundy SUV seen by witnesses. The defense argued that the Minten/Dante A. shooting could not have been committed in retaliation for the Guzman murder because the two incidents occurred six months apart. The defense pointed out that it made more sense to find that the Smith murder, which occurred the day after the Guzman murder, was committed in retaliation for the Guzman murder. The defense also sought to show that Minten had been dealing drugs and that he was targeted by some gang members—not from the City Hall gang— who wanted Minten to pay "taxes" on his drug sales.

Officer Eddie Santana saw a burgundy SUV in Watsonville on August 16, 2005. The driver looked like defendant. When he called dispatch, he learned that defendant's car was still impounded. He tried to follow the vehicle, but he lost track of it.

Linda Ramos, Harrington's mother, testified that about seven days after the Milton/Dante A. shooting she saw a burgundy SUV at the Stone Creek Apartments,

16

which are located on "[t]he other side of town" from Palm Avenue.  She informed the police of the vehicle's location.  Ramos also testified that at Minten's funeral, people were saying that defendant was bragging about being involved in the homicide.[5]

After the Minten/Dante A. shooting, Officer Skip Prigge searched a trailer behind Minten's house.  Minten had been living in the trailer along with Ezekiel Rodriguez, also known as Isaac Hernandez.  In the trailer, Officer Prigge found notebooks with "pay and owe sheets," which are typically used by street-level narcotics dealers.  The notebooks were found among Minten's personal belongings, not in the area where Ezekial Rodriguez was staying.

District Attorney inspector Henry Montes interviewed Dante A. in April of 2012.  Dante A. said that he had been using methamphetamine and marijuana around the time of the shooting.  Dante A. said that Minten had $600 to $1,000 in cash on him at the time of the shooting, as well as an ounce or two of marijuana.  Dante A. described being in a "crew" with Minten, which would "go on missions and go and kick some ass and represent."

Several witnesses testified about an incident on January 10, 2005, in which Minten was found injured at a trailer park.  Marijuana was on the ground near Minten, and Minten had $306 in cash on him.  A white truck was seen leaving the area at a high rate of speed.

Michael Harrington, one of Minten's best friends, testified that he and Minten sold drugs at the time of the Minten/Dante A. shooting.  This drew the attention of some gangs, including Northside and Landis.  At some point prior to the Minten/Dante A. shooting, some members of the Landis gang had come to Harrington's house.  Northside gang member Isaac Valdavia was with the Landis gang members.  The gang members

---

[5] Defendant elicited this testimony to show that "gossip" about defendant's involvement had resulted from the police targeting defendant as their suspect.

17

had a hostile attitude and wanted drugs from Harrington and Minten. Minten gave the gang members "a 40" of methamphetamine. Harrington assumed that the gang members wanted the drugs "as sort of a tax." Like Dante A., Harrington described being in a "crew" with Minten. According to Harrington, their crew had Norteño ties but was not associated with a specific subset. Minten tended to associate with Northside, Varrio Green Valley, Watsonville Varrio Norte, and Clifford Manor Locos, and he considered City Hall an enemy.

Minten's friend Timothy Ochoa testified that Minten had been concerned about being killed by gang members who wanted him to pay rent or taxes for selling drugs. Minten said that Valdivia would be "the snitch" responsible for his death—i.e., that Valdivia would have reported Minten to the higher-ups.

The defense presented its own gang expert, private investigator and former law enforcement officer Glenn Rouse. His testimony about the history, symbols, and rules of Norteño gangs was similar to the testimony of Detective Chappell. Rouse testified that a Norteño gang member who commits a violent act on another Norteño without authority from a high-ranking Norteño is subject to discipline, including death. He also testified that a teardrop tattoo originally meant that "you had killed somebody," but that it now could mean that you had spent time in prison or that you had lost a family member or fellow gang member. Non-gang members sometimes get teardrop tattoos to look tough. Rouse testified that gangs use violence to get money from drug dealers in their areas, whether or not those drug dealers are gang members.

The defense also presented evidence that Minten had accused Bryan Jones of stealing $6,000 from him in November of 2004. After Minten came looking for Jones, the Jones's vehicle was burned in an arson incident.

The defense sought to discredit Marco Lopez's statements. The defense introduced evidence that Lopez had been in and out of custody prior to his arrest in June of 2005 and suggested that, at the time of his interview, Lopez was seeking to parlay

18

information about the Minten/Dante A. shooting into benefits for himself. Officer Montalbo acknowledged that Lopez was a heroin addict and that Officer Montalbo had initiated the topic of the war between City Hall and Northside. Officer Montalbo also acknowledged that he had suggested Lopez say that he was carrying a gun because Northside or City Hall was after him. Officer Montalbo had offered to contact the District Attorney to try to help Lopez "work something out." Officer Montalbo told Lopez that if he went to prison for a long time, he would not be able to see his baby or his girlfriend. Lopez said that defendant had committed the Minten/Dante A. shooting only after Officer Montalbo made these statements.

### J.    Charges, Verdicts, and Sentence

Defendant was charged with the murder of Minten (§ 187, subd. (a); count 1), the attempted murder of Dante A. (§§ 664/187, subd. (a); count 2), and participation in a criminal street gang (§ 186.22, subd. (a); count 3). As to counts 1 and 2, the information alleged that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that a principal used and personally and intentionally discharged a firearm that caused great bodily injury or death (§ 12022.53, subds. (b)-(d), (e)(1)).

The jury convicted defendant of all three counts. The jury found that the murder was premeditated and deliberate first degree murder. The jury found that both the murder and attempted murder were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) As to both the murder and attempted murder, the jury found that a principal personally and intentionally discharged a firearm that caused great bodily injury or death (§ 12022.53, subds. (d), (e)(1)), and further found that defendant himself

19

personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (e)(1)[6]).

The trial court sentenced defendant to a prison term of 94 years 8 months to life: 25 years to life for the murder (§ 187, subd. (a), with a consecutive term of 25 years to life for discharging a firearm (§ 12022.53, subd. (d)); nine years for the attempted murder (§ 664/187, subd. (a)), with a consecutive term of 25 years to life for discharging a firearm (§ 12022.53, subd. (d)) and a consecutive term of 10 years for the gang enhancement (§ 186.22, subd. (b)); and a consecutive term of eight months for the substantive gang offense (§ 186.22, subd. (a)).

## III.    DISCUSSION

### A.    *Admission of Gang Expert Testimony About Lopez's Statements*

Defendant contends the trial court erred by permitting the gang experts to testify that Lopez said (1) defendant had admitted that he was the shooter and (2) that the Minten/Dante A. shooting was part of a gang war.  Defendant claims the gang expert testimony violated his Sixth Amendment right of confrontation as well as state evidentiary rules, including Evidence Code section 352.

#### 1.    Motion in Limine

Defendant filed a motion in limine to exclude and limit gang evidence.  Defendant argued that expert opinion about gangs should be limited to material that would help the jury understand the significance of certain evidence, "not to fill in factual gaps." Defendant noted that gang evidence is "extremely prejudicial" and sought exclusion of specific evidence pursuant to Evidence Code section 352, including testimony that the Minten murder was an "intra-gang retaliation hit."

---

[6] As to this finding, the verdict forms contain the language of section 12022.53, subdivision (d) but reference section 12022.53, subdivisions (b) and (e)(1).

20

At the April 30, 2012 hearing on motions in limine, the trial court indicated it would not allow the gang experts to testify that defendant had committed the shooting, but that they could opine that the shooting was committed for the benefit of a criminal street gang. The court indicated it understood that defendant did not want the experts to testify that the shooting was "an intra-gang hit" without "underlying evidence concerning those facts."

The prosecutor brought up Lopez's statement about defendant admitting that he had killed Minten. The prosecutor argued that the gang experts could rely on Lopez's statement, asserting that Lopez's statement was reliable because it came from a fellow gang member.

During the continued motion in limine hearing the following day, defendant brought up the question of whether Lopez's statement could come in through the gang experts. Defendant pointed out that Lopez had refused to testify at the preliminary hearing. He objected to the use of Lopez's statement as the basis for an expert opinion unless Lopez testified at trial. The trial court indicated it understood that defendant did not want the jury to hear about "an admission that's hearsay from a witness that's not available for you to cross-examine."

The prosecutor argued that the gang experts could properly rely on out-of-court statements in rendering their opinions, and that the defense could show that the out-of-court statements were not credible evidence. The prosecutor nevertheless indicated he would not introduce Lopez's statement about defendant's admission to the Minten murder without further briefing and discussion.

The trial court ordered the prosecutor not to mention Lopez's statement or elicit it from a witness "without prior authority from the Court." The trial court noted it would be "very difficult to have the jury consider it only for the purpose of evaluating the basis of the expert's opinion as opposed to considering it as an admission."

## 2. Trial Discussions

During trial, the prosecutor informed the trial court that Lopez had indicated he would not testify. The prosecutor nevertheless wanted to bring Lopez in to be questioned in front of the jury. The prosecutor wanted to ask Lopez about statements he made that would be used as the basis for expert opinion, including (1) statements about there being "bad blood" between City Hall and Northside, and (2) defendant's admission about committing the Minten murder. The trial court indicated it would hold an Evidence Code section 402 hearing before permitting Lopez to be questioned in front of the jury if he was unwilling to testify.

Later in the trial, defendant raised the issue of whether the gang experts could testify that the Minten/Dante A. shooting was done in retaliation for the Guzman shooting. The trial court initially ruled that Lopez's statements to that effect could not come in if Lopez did not testify "because it's unduly prejudicial." The trial court noted that the issue was "principally controlled by a[n Evidence Code section] 352 analysis."

The prosecutor explained that he wanted Officer Montalbo to testify that the "word on the street" was that Guzman, a City Hall gang member, had been killed by members of the Northside subset; that Minten, a Northside associate, had been killed in retaliation for the Guzman killing; and that Lopez, a City Hall member, claimed he carried a gun because he feared retaliation from Northside. Defendant argued that such evidence was not the proper subject of expert opinion testimony.

The trial court ruled that Officer Montalbo could testify about the gang affiliations of individuals including Minten and Guzman. Officer Montalbo could also testify about the date of the Guzman murder and law enforcement's theory about who killed him. Additionally, the trial court would allow Officer Montalbo to give opinions "based upon the hearsay statement of Marco Lopez that when he's arrested with a gun, he's carrying a gun, he's a City Hall member, he's carrying a gun because he's concerned about retaliation from Northside because of the Minten murder."

22

Defendant objected. Defendant complained that he would have no opportunity to cross-examine Lopez, "the source of this information."

The trial court ruled that Officer Montalbo was "definitely not going to be permitted to testify that Marco Lopez told him or any other law enforcement agent" that defendant "admitted to the killing." Officer Montalbo would only be permitted to testify about "what gang Lopez was affiliated with and that Lopez told him he was carrying the gun because the word among City Hall and the gangs in the streets was that as a City Hall member he could expect a retaliation for the Minten killing because the inference there is that the Minten killing was conducted by a City Hall gang member." The trial court reiterated that Officer Montalbo could give an opinion as to Guzman's gang affiliation and an opinion as to the identity and gang affiliation of the person suspected in Guzman's murder. The court indicated it could instruct the jury to disregard evidence that had inadequate foundation or was not sufficiently reliable.

### 3. Officer Montalbo's Trial Testimony

Following the above discussion, Officer Montalbo testified that in June of 2005, he had contact with Lopez, who had been carrying a firearm. Lopez told Officer Montalbo that "he was carrying the gun because he was a City Hall gang member and he was in fear of retaliation from Northside Watsonville" because of the Minten homicide. Lopez said "the killing of Wayne Minten was a direct result of retribution for the killing of Isaac Guzman." Defendant's objections to this testimony were overruled.

Officer Montalbo went on to testify that he had "dealt with" Lopez for several years and knew Lopez to be a member of City Hall. According to Officer Montalbo, Lopez faced potential consequences for sharing information with the police: he would be labeled as a snitch, and he would become a "target for violence" by his own gang and other Norteño gang members.

Officer Montalbo opined that the Minten/Dante A. shooting was gang related. He based his opinion on "the retaliation issue between the two gangs," as well as information

23

he had gathered "on the street day in and day out," the fact that it was a drive-by shooting, and the fact that Minten was a Northside associate.

### 4. Lopez's Refusal to Testify

Later in the trial, Lopez was brought in to court. Although he had been offered immunity, he refused to take the oath, accept the immunity offer, or answer any questions. He was advised he would be in contempt of court, but he still refused to testify.

The trial court made further rulings on the scope of gang expert testimony following Lopez's refusal to testify, reiterating that Detective Chappell could testify that Lopez said that he carried a gun after the Minten/Dante A. shooting because he expected retaliation.

Defendant objected to any such testimony about Lopez's statements, since he would not be able to cross-examine Lopez. Defendant further objected that Detective Chappell was being permitted to introduce the very facts his opinion was based on, not facts "rooted in" the evidence.

Prior to the testimony of Detective Chappell, the trial court held a further hearing on the scope of his expert testimony. The parties discussed whether Detective Chappell should be permitted to give the opinion that Minten was an associate or member of the Northside gang. The prosecutor referenced Lopez's statements to Officer Montalbo about the Minten homicide being part of a "war" between Northside and City Hall, and he argued that this statement was the proper basis for an opinion about Minten's gang association. The trial court reiterated that it was denying the defense motion to exclude expert opinion about the motive for the Minten homicide.

### 5. Detective Chappell's Trial Testimony

On direct examination, Detective Chappell testified about the Lozano shooting, the Guzman murder, and Lopez's arrest in June of 2005. Detective Chappell testified that Lopez told the police about "the war" between City Hall and Northside and about a gang

leaders' meeting held shortly after the Minten/Dante A. shooting, which included defendant. Detective Chappell testified that it was rare for a gang member to provide this kind of information, a fact that was significant to Lopez's reliability.

Detective Chappell then rendered his opinions about defendant's active participation in a criminal street gang, defendant's knowledge that City Hall gang members had engaged in a pattern of criminal gang activity, and defendant's promotion of the City Hall gang. After hearing a hypothetical set of facts that included Lopez's statements, Detective Chappell also rendered his opinion that the Minten murder would benefit the City Hall gang.

During cross-examination, defendant sought to have Detective Chappell acknowledge that Lopez was not credible. Defendant asked Detective Chappell if he was aware of certain incidents in Lopez's criminal history and evidence that Lopez was a heroin addict. Defendant suggested Lopez's credibility was diminished by his fear of going to prison for the gun charge. In response, Detective Chappell explained that what "pull[ed] the most weight" in terms of Lopez's credibility was the fact that he had named people in his own gang, including defendant.

Prior to the prosecution's redirect examination of Detective Chappell, the prosecutor argued that the defense had "open[ed] the door" to the introduction of more details about Lopez's statement by conducting a detailed cross-examination of Lopez regarding his prior criminality and drug addiction. The prosecutor argued that he should be able to introduce the fact that Lopez told the police that defendant had bragged about killing Minten. The prosecutor argued that this would "completely put Marco Lopez's credibility at issue" and explain why Detective Chappell would believe Lopez.

The trial court observed that cross-examination had "left the jury with the impression that Detective Chappell is acting unreasonably or his opinion is unreliable because he has taken the word of Marco Lopez . . . ." The trial court indicated it thought

25

that Lopez's identification of defendant as the shooter was "an important piece as to why Marco Lopez's statement is believable . . . ."

Defendant argued that he had not "opened the door." Defendant also observed that admitting Lopez's statement through a gang expert would present "confrontation issues."

The trial court ruled that it would "reluctantly" allow the prosecution to elicit Lopez's statement about defendant's admission to the Minten shooting, and that it would give "a strong admonition" to the jury.

On redirect examination, Detective Chappell explained that he had personally spoken to Lopez, and that Lopez had affirmed all the statements he had previously made to Officer Montalbo. Detective Chappell affirmed that the details Lopez had provided gave his statement credibility. The prosecutor then asked, "What other . . . things did Marco Lopez tell you and also Sergeant Montalbo back in June of 2005 that you considered in terms of your opinion as to the reliability of that statement in reaching your opinion?" Detective Chappell replied, "He said that [defendant] told him at that . . . gang meeting that he had shot and killed Wayne Minten, and not only that had he shot and killed him, but he wanted Marco Lopez to kill the surviving victim because he was afraid that he would testify against him."

Detective Chappell testified that it was "very, very rare and very, very dangerous" for a gang member to name someone in his own gang as having admitted to a killing. He anticipated that "attempts will be made on Marco Lopez's life after this."

Defendant later called Officer Montalbo and asked questions aimed at demonstrating that Lopez's statement was not reliable. Defendant elicited Officer Montalbo's testimony that Lopez was a heroin addict and that Officer Montalbo had offered to help Lopez in exchange for information.

26

### 6. Jury Admonitions

After Officer Montalbo testified that Lopez said he was carrying a gun because he was a City Hall gang member and feared retaliation from Northside, the trial court instructed the jury: "[B]ecause Mr. Lopez is not here under oath to be cross-examined, you have no way to evaluate the truth or accuracy of that statement. So I'm permitting you to hear this testimony, which is hearsay and would not otherwise be admissible, only to evaluate this witness's opinion, the information he's relying [on] to render an opinion. So do not consider Mr. Lopez's statement for the truth of the matter asserted. The only use of this [is] to evaluate the reliability of this witness's opinion."

Following Officer Montalbo's opinion testimony about the Minten/Dante A. shooting being gang-related and done in retaliation for the Guzman killing, the trial court admonished the jury again. The trial court first told the jury that in evaluating the expert testimony, it should consider "any facts or information on which the expert[] relies and reaches any opinion. You have to decide whether the information on which the expert relies is true and accurate." The trial court then told the jury that as to Lopez's hearsay statements, "you cannot consider those statements for the truth because he's not here to be cross-examined. You can only consider those as it relates to you evaluating the reliability of [Officer] Montalbo's opinion testimony."

In the middle of Detective Chappell's testimony on cross-examination, the trial court admonished the jury: "And I do want to remind you . . . with respect to the testimony that this witness [has] been permitted to give about statements that are contained in police reports that he has reviewed, you're not to consider the statements for the truth of the matter asserted. [¶] In other words, anything Marco Lopez said to Officer Montalbo in Officer Montalbo's report contains his statements [*sic*], you can't consider those statements for the truth of the matter asserted. You can only consider those statements in evaluating the reliability of Detective Chappell's expert opinion, whether it's appropriate for this expert to rely on those statements, because we are talking

27

about multiple levels of hearsay. [¶] Marco Lopez isn't here to be cross-examined under oath, and so don't rely -- don't use the statements of Marco Lopez for the truth of the matter contained in the statements, namely that Wayne Minten was perceived to be a member or an associate of a criminal street gang or the Northside gang or any other subject matters contained in those statements. [¶] You are only permitted to hear about this to evaluate whether the expert's opinion is reliable. . . ."

The trial court then read an instruction based on CALCRIM No. 332: "A witness or witnesses are allowed to testify as experts and to give an opinion if they are qualified. And this expert is qualified as an expert on gang issues. You must consider the opinions, but are not required to accept them as true or correct. The meaning and importance of any opinions are for you to decide. [¶] In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. . . . [¶] In addition, consider the expert's knowledge, skill, experience, training and education, the reason the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. [¶] You must decide whether . . . information [on] which the expert relied is true and accurate. You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence. . . ."

The trial court also admonished the jury immediately after Detective Chappell testified that, according to Lopez, defendant admitted committing the Minten shooting: "You may not consider what you've just heard for its truth. In other words, Marco Lopez is not here to be cross-examined, so you may not consider the statement that he allegedly made about what [defendant] said to him for the truth of that matter. [¶] You can only consider it as to why Detective Chappell was relying on his statement in rendering the opinions that he rendered today, and Detective Chappell was rendering his opinions only as it relates to the charge as to whether or not [defendant] is a gang member, an active participant in a criminal street gang, and also whether the particular crime was allegedly committed . . . for the benefit of the criminal street gang. [¶] That's why his opinions

28

have been admitted. So I'm permitting you to hear this testimony only to evaluate whether it's reasonable for Detective Chappell to rely on Marco Lopez's statement in rendering the opinions he's rendered. [¶] You may not consider Marco Lopez's statement for the truth that [defendant] said these things to him. In other words, there is no admission here that you can consider as to the homicide charge or whether [defendant] committed this offense. It's up to you to evaluate whether Detective Chappell is reasonable in relying on the statement of Mr. Lopez in rendering his opinions, and that is the reason you are hearing this testimony."

The trial court gave the jury yet another admonition when it recessed for the day in the middle of Detective Chappell's redirect examination. The court reiterated that it had allowed testimony about Marco Lopez's statement only for "limited purposes." The court instructed the jury: "[W]hen you start your deliberations you may not go back into the jury room and say, well, [defendant] has made an admission in this case. He's confessed to the crime. [¶] You may not consider what Marco Lopez said to Officer Montalbo for its truth, because you have no way of evaluating Marco Lopez's credibility, because he is not here being subject to cross-examination. [¶] It would be entirely different if Marco Lopez came into the courtroom, raised his right arm and took an oath an[d] was subjected to direct examination and cross-examination and testified in front of you under oath after he had been cross-examined, that [defendant] said to him I committed this murder. [¶] You have no evidence that that statement is true, and you may not consider it. You may not discuss it in the deliberation room in evaluating whether or not [defendant] is guilty or not guilty of the offense of murder. [¶] This witness has been called to render an opinion on the one substantive charge as to whether or not [defendant] is an active participant in a criminal street gang. There are various elements to that offense, and he's rendered opinions on that as to whether or not the crime that is alleged to have been committed in this case was committed for the benefit of a criminal street gang, and that's the sole reason for this witness'[s] appearance in this

29

case." The trial court then discussed Detective Chappell's testimony about defendant's teardrop tattoo, explaining that Detective Chappell had personal knowledge of the tattoo and that the jury could determine whether the tattoo constituted a "nonverbal admission." The trial court then again reminded the jury, "[Y]ou may not go into the jury room and say that [defendant] has admitted the commission of a murder to Mr. Marco Lopez, because Mr. Lopez is not here to be cross-examined. [¶] Only evaluate that statement for the purposes of determining whether Detective Chappell's opinions are reasonable and reliable."

After Officer Montalbo testified as a defense witness, the trial court gave another jury admonition: "I do want to remind you that the testimony you've just heard about the contents of Marco Lopez's statement to this officer is hearsay, so nothing that Marco Lopez [said] is to be considered [by] you for the truth of the matter about what he was talking about. I permitted you to hear about it so you could discuss[] the reliability and believability of Detective Chappell's testimony with respect[] to whether it was reasonable or appropriate for him to rely on Marco Lopez's statements and to use Marco Lopez's statement as it was detailed in the officer's report concerning his opinions about gang member[s], and whether the alleged crime was committed for the benefit of a criminal street gang."

In the pre-deliberation instructions, the trial court gave the jury further admonitions related to the Lopez statement. The jury was reminded that "certain evidence was admitted for a limited purpose" and that the jurors could "consider that evidence only for that purpose and for no other purpose." (See CALCRIM No. 303.) The jury was instructed on how to consider expert witness testimony, and that in determining the believability of an expert witness, it could consider "the facts or information on which the expert relied" after deciding "whether the information on which the expert relied was true and accurate." (See CALCRIM No. 332.) The trial court also read a special instruction, which provided: "Morgan Chappell testified that in reaching

30

his conclusions as an expert witness, he considered statements made by Marco Lopez. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

### 7. Motion for a New Trial

After the jury reached its verdicts, defendant moved for a new trial on a number of grounds. Defendant argued that the trial court erred by admitting testimony about Lopez's statements.

At the October 2, 2012 sentencing hearing, the trial court denied the motion for a new trial. The trial court rejected defendant's claim that the court should not have allowed Detective Chappell to testify that, according to Lopez, defendant had admitted being the shooter. The court explained, "[G]iven the nature of the cross-examination of [Detective] Chappell it was necessary for the jury to have that testimony so that the jury could adequately evaluate the believability and reliability of Detective Chappell's testimony."

### 8. The Parties' Contentions on Appeal

Defendant contends that the trial court erred by admitting Lopez's statements through the testimony of the gang experts (Officer Montalbo and Detective Chappell). He argues that the Sixth Amendment's Confrontation Clause prohibits expert witnesses from relaying testimonial hearsay to the jury, even if the underlying out-of-court statements are not offered for their truth.

Defendant alternatively contends that the trial court abused its discretion by admitting Lopez's statements through the testimony of the gang experts. He claims that the trial court should have excluded the evidence of Lopez's statements under general evidentiary principles applicable to expert testimony, including—primarily—Evidence Code section 352.

31

The Attorney General contends that testimonial hearsay may properly be admitted as the basis for expert opinion testimony because such evidence is not offered for its truth. The Attorney General further contends that the trial court did not abuse its discretion by admitting the gang experts' testimony about Lopez's statements.

### 9. Confrontation Clause and "Basis Evidence"

We first address the question whether the gang experts' testimony about Lopez's out-of-court statements violated the Sixth Amendment's Confrontation Clause.

The Sixth Amendment to the United States Constitution guarantees the accused in criminal prosecutions the right "to be confronted with the witnesses against him [or her]." In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that this provision prohibits the admission of testimonial hearsay unless the witness is unavailable or there was a prior opportunity for cross-examination. (*Id.* at p. 68.) The *Crawford* court further noted that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Id.* at p. 59, fn. 9.)

In this case, the jury was instructed that Lopez's out-of-court statements were not admitted for "the truth of the matter asserted" (*Crawford, supra,* 541 U.S. at p. 59, fn. 9), but as the basis for the gang experts' opinions regarding whether the charged murder and attempted murder were gang-related. The trial court repeatedly admonished the jury that the statements were only being admitted so that the jury could assess whether the gang experts' opinions were reliable.

The California Supreme Court has not yet considered whether the confrontation clause prohibits a gang expert from relying on hearsay to provide evidence that a particular crime was committed for the benefit of a gang. However, in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), the court reasoned that, "[c]onsistent with [the] well-settled principles" concerning expert witness testimony, a detective "could testify as an expert witness and could reveal the information on which he had relied in

32

forming his expert opinion, including hearsay." (*Id.* at p. 619.) *Gardeley* reasoned that gang experts can rely on inadmissible hearsay because such evidence is not offered as " 'independent proof' of any fact." (*Ibid.*)

Defendant contends that recent confrontation clause cases bar experts from relaying testimonial hearsay statements to the jury, even when the jury is told that the statements are not offered for their truth.[7]

In *Williams v. Illinois* (2012) 567 U.S. ___, ___ [132 S.Ct. 2221, 2240] (*Williams*), the United States Supreme Court considered whether "basis evidence" —that is, evidence that provides a basis for an expert opinion—is admissible under the confrontation clause. In *Williams,* the question was, "[D]oes *Crawford* bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify?" (*Id.* at p. ___ [132 S.Ct. at p. 2227].) The *Williams* court examined whether a laboratory expert could rely on a DNA report from a prior criminal case in rendering his opinion that the defendant's DNA profile matched the prior sample. In a 4-1-4 opinion, the court held that admission of the expert's testimony did not violate the confrontation clause.

A plurality of the *Williams* court found two grounds for admitting the expert testimony over the defendant's confrontation clause objection. First, the "basis evidence" was not offered for its truth: "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct at p. 2228] (plur. opn. of Alito, J., joined

---

[7] The California Supreme Court is currently considering whether the Sixth Amendment right to confrontation bars a gang expert's reliance on testimonial hearsay. (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted Feb. 24, 2015, S216681 (*Sanchez*); see also *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640 [briefing deferred pending consideration and disposition of *Sanchez*].)

by Roberts, C. J., Kennedy & Breyer, JJ.).)  However, the other five justices disagreed with the plurality on this point, finding that the "basis evidence" *was* offered for its truth. (See *id.* at p. ___ [132 S. Ct. at p. 2257] (conc. opn. of Thomas, J.) ["statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose"]; *id.* at p. ___ [132 S.Ct. at p. 2268] (dis. opn. of Kagan, J., joined by Scalia, Ginsburg, and Sotomayor, JJ.) [expert's statements about the DNA report "went to its truth, and the State could not rely on her status as an expert to circumvent the Confrontation Clause's requirements"].)

Second, the *Williams* plurality found that even if the "basis evidence" was offered for its truth, it was not testimonial.  (*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct at p. 2228] (plur. opn. of Alito, J., joined by Roberts, C. J., Kennedy & Breyer, JJ.).)  The DNA report was "produced before any suspect was identified," it was sought "for the purpose of finding a rapist who was on the loose" rather than to obtain evidence against the defendant, and it was "not inherently inculpatory."  (*Id.* at p. ___ [132 S.Ct at p. 2228].)  Justice Thomas agreed with the plurality on this point, finding that the "basis evidence" was not testimonial because it "lack[ed] the solemnity of an affidavit or deposition" and, "although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation."  (*Id.* at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).)

The *Williams* decision does not persuade us that the admission of evidence that serves as the basis for an expert's opinion, for the limited purpose of assessing that opinion, transforms such evidence into independent proof of any fact.  We acknowledge that five of the *Williams* justices indicated they would have found that the basis evidence was offered for its truth.  However, when the United States Supreme Court issues an opinion, "it is not only the result but also those portions of the opinion *necessary to that result* by which we are bound.  [Citations.]"  (*Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 67, italics added.)  "When a fragmented Court decides a case and no single

rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' [Citation.]" (*Marks v. United States* (1977) 430 U.S. 188, 193.) As Justice Chin of the California Supreme Court observed in his concurring opinion in *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), "neither the plurality opinion nor Justice Thomas's concurring opinion [in *Williams*] can be viewed as a logical subset of the other. Indeed, to some extent they are contradictory." (*Id*. at p. 628 (conc. opn. of Chin, J.).) Justice Chin noted that "[i]t took a combination of two opinions—each containing quite different reasoning—to achieve the majority result." (*Id*. at p. 627 (conc. opn. of Chin, J.).) Further, as the California Supreme Court has stated concerning *Williams*, "dissenting opinions are not binding precedent. [Citations.]" (*People v. Lopez* (2012) 55 Cal.4th 569, 585 (*Lopez*).) We do not believe that the common view expressed in Justice Thomas's concurring opinion (in which no other justice joined) and the dissenting opinion in *Williams*, that the extrajudicial basis of an expert's opinion is necessarily considered for its truth regardless of its admission for a nonhearsay purpose with a limiting instruction, may be taken as a holding of the United States Supreme Court since it is not yet the basis of any judgment. While dicta or a dissenting opinion may signal the future direction of a court, especially when a view is subscribed to by a majority of justices presently on the court, we must follow the United States Supreme Court's binding precedents and leave to that court the prerogative of overruling its own decisions. (See *Agostini v. Felton* (1997) 521 U.S. 203, 237-238.)

The California Supreme Court's 2012 trio of Sixth Amendment confrontation cases also do not hold that basis evidence is offered for its truth. In *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661, the court held that any confrontation clause violation in admitting a toxicology analysis of the victim's blood was harmless because the evidence of guilt was overwhelming. In *Dungo, supra,* 55 Cal.4th at page 621, the court held there was no confrontation violation since the primary purpose for an autopsy

35

report was not a criminal investigation. In *Lopez, supra,* 55 Cal.4th at page 582, the court held that critical portions of a nontestifying analyst's laboratory report on the defendant's blood alcohol concentration were not made with the requisite degree of formality or solemnity to be considered testimonial. None of those three cases mentioned *Gardeley*, nor did they effectively overturn *Gardeley*.

As an intermediate court, we are required to follow *Gardeley*'s holding that "basis evidence" for a gang expert's opinion is not offered as " 'independent proof' of any fact." (*Gardeley, supra,* 14 Cal.4th at p. 619; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Our conclusion is consistent with the conclusion reached by Division Five of the First District Court of Appeal in *People v. Hill* (2011) 191 Cal.App.4th 1104 (*Hill*). The *Hill* court noted that in many cases, an expert's opinion is meaningful only if the jury finds its basis true. (*Id.* at p. 1131.) The *Hill* court discussed the possibility that the California Supreme Court would reconsider *Gardeley* and conclude that "basis evidence is offered for its truth." (*Id.* at p. 1132; see also *People v. Valadez* (2013) 220 Cal.App.4th 16, 32.) However, the *Hill* court held that it was required to "follow *Gardeley* and the other California Supreme Court cases in the same line of authority." (*Hill, supra,* at p. 1131, fn. omitted.) The *Hill* court thus concluded that the trial court had properly allowed a gang expert to relate "basis evidence" because the out-of-court statements were not admitted for their truth. (*Ibid.*)

As of yet, there is no United States or California Supreme Court case holding that testimony regarding the basis for an expert's opinion, which was *not* admitted for its truth at trial, must nevertheless be regarded as admitted for its truth for purposes of the Sixth Amendment's right of confrontation even when a limiting instruction is given. Presently, binding precedent is to the contrary. Thus, in this case, we conclude that the admission of Lopez's statements through the testimony of the gang experts, with repeated admonitions that the jury not consider those statements for the truth, did not violate the Sixth Amendment.

## 10. Evidence Code Section 352

Defendant also contends that the trial court should have excluded Lopez's out-of-court statements pursuant to Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"Broadly speaking, evidence tends to be more prejudicial than probative when it poses an intolerable risk to the fairness of the proceedings or reliability of the outcome. [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 231 (*Lucas*).) "For purposes of a[n Evidence Code] section 352 analysis, evidence is unduly prejudicial if it tends to create an emotional bias against a defendant that could inflame the jury, while also having a negligible bearing on the issues. [Citation.]" (*Id.* at p. 268.)

"[A]n Evidence Code section 352 determination is reviewed by applying an abuse of discretion standard. [Citation.]" (*Lucas, supra,* 60 Cal.4th at p. 268.) Thus, a decision to admit evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the probative value of the evidence "clearly is outweighed by [its] prejudicial effect. [Citation.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 336 (*Hughes*).)

The California Supreme Court has explained that Evidence Code section 352 may be used to prevent the jury from hearing evidence that forms the basis for an expert opinion when that evidence poses a potential for prejudice that outweighs its probative value. Although an expert may base his or her opinions on inadmissible hearsay and explain the reasons for those opinions, including the matters he or she considered in forming them, " 'prejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " ' [Citations.] In this context, the court may ' "exclude from an expert's testimony any

37

hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." ' [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 137.)

The rationale for using Evidence Code section 352 to limit an expert's testimony about inadmissible hearsay is to ensure the jury does not consider the inadmissible hearsay for its truth. If an expert is permitted to testify as to the details of inadmissible hearsay upon which he or she relied, "the jury might improperly consider such testimony as independent proof of the facts described in the [testimony] and the adverse party is denied the opportunity to cross-examine the person who made the statements. [Citations.]" (*People v. Dean* (2009) 174 Cal.App.4th 186, 196-197 (*Dean*).)

"Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his [or her] opinion and should not be considered for their truth. [Citation.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 919.) However, "[s]ometimes a limiting instruction may not be enough. In such cases, Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. [Citation.]" (*Ibid.*)

When Evidence Code section 352 is applied to evidence that serves as the basis for an expert opinion, " 'probative value' refers to the relative reliability of the inadmissible evidence and its necessity to the jury's understanding of the credibility and bases for the expert opinion. This must be weighed against the risk that the jury will view and use this inadmissible evidence for an improper purpose, i.e., as substantive evidence against the defendant." (*Dean, supra,* 174 Cal.App.4th at p. 199.)

In this case, the trial court initially indicated it would exclude the gang experts' testimony about Lopez's statements pursuant to Evidence Code section 352, finding that it would be "very difficult to have the jury consider it only for the purpose of evaluating the basis of the expert's opinion as opposed to considering it as an admission." However, the trial court later allowed the gang experts to describe Lopez's statements about the

shooting being part of a gang war between Northside and City Hall. Then, after the defense cross-examined Detective Chappell, the trial court allowed Detective Chappell to testify that Lopez said that defendant had admitted committing the Minten homicide. The trial court found that the statement was admissible to assist the jury in assessing whether Detective Chappell reasonably relied on Lopez's other statements.

As noted above, under Evidence Code section 352, the probative value of basis evidence depends on "the relative reliability of the inadmissible evidence and its necessity to the jury's understanding of the credibility and bases for the expert opinion." (*Dean, supra,* 174 Cal.App.4th at p. 199.) Although the gang experts said that Lopez's statements were reliable because it was rare for a gang member to provide information, there were also reasons to question the reliability of the statements: at the time, Lopez was facing felony weapons charges, and Officer Montalbo had suggested that Lopez might be able to parlay information in exchange for possible leniency. Moreover, the jury could have assessed the reliability of Lopez's statements without learning that Lopez had reported that defendant admitted committing the Minten murder. The gang experts had already testified that gang members rarely cooperate with law enforcement, that Lopez had told them about a gang meeting and provided the names of the persons in attendance, and that they felt Lopez was reliable because it was rare for the police to get that type of detailed information from a gang member.

More importantly, any probative value of Lopez's statements—particularly those concerning defendant's admission to the charged offense—was outweighed by the risk that the jury would "view and use this inadmissible evidence for an improper purpose, i.e., as substantive evidence against the defendant." (*Dean, supra,* 174 Cal.App.4th at p. 199.) The California Supreme Court has recognized "that confessions, 'as a class,' '[a]lmost invariably' will provide persuasive evidence of a defendant's guilt [citation], and that such confessions often operate 'as a kind of evidentiary bombshell which shatters the defense' [citation]." (*People v. Cahill* (1993) 5 Cal.4th 478, 503.) In an

analogous context, the United States Supreme Court has recognized that it is improper to admit the confession of a nontestifying codefendant that names and incriminates the defendant at a joint trial, even where the jury is instructed to consider the confession only against the codefendant, because jurors cannot be expected to ignore the statements of one defendant that are "powerfully incriminating" as to another defendant. (*Bruton v. United States* (1968) 391 U.S. 123, 135; see *id*. at pp. 124-126, 135-136.)

The risk that the jury would misuse Lopez's statements as evidence of defendant's guilt was not diminished by the instructions and admonitions in this case. Although the trial court instructed the jury it could only use Lopez's statements to evaluate whether the gang expert opinions were reliable, the court also repeatedly told the jury that in order to perform that evaluation, it had to "decide whether [the] information upon which the expert relied is true and accurate." Thus, the jury was not truly able to utilize Lopez's out-of-court statements to evaluate the expert opinions "without first determining if, or accepting that, those statements were true." (*Hill, supra,* 191 Cal.App.4th at p. 1137.)

In light of the serious danger that, even with limiting instructions, the jury would consider Lopez's statements as evidence of defendant's guilt, the trial court should have adhered to its initial decision to bar the gang experts from testifying about Lopez's statements pursuant to Evidence Code section 352. The probative value of Lopez's statements was "clearly . . . outweighed by their prejudicial effect. [Citation.]" (*Hughes, supra,* 27 Cal.4th at p. 336.) Thus, the trial court erred by allowing the gang experts to testify that Lopez told them that defendant admitted committing the Minten homicide and that the Minten/Dante A. shooting was part of a gang war.

## 11. Prejudice

Having determined that the trial court erred by admitting Lopez's statements through the testimony of the gang experts, we turn to the question of prejudice. Generally, state law error in admitting evidence is subject to the traditional *Watson* test, under which the reviewing court determines whether it is reasonably probable the verdict

40

would have been more favorable to the defendant absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

The primary issue in this case was whether defendant was the driver of the Yukon and/or the shooter—as noted above, the prosecutor argued that defendant was both the driver and the shooter, but he also argued that defendant could be found guilty as an aider and abettor even if he was only the driver.

The evidence left little question that defendant's car—a burgundy Yukon—was the vehicle from which the shooting occurred and that defendant was driving it at the time of the shooting. Numerous witnesses saw a burgundy SUV at the time of the shooting, and all of them identified defendant's Yukon as at least similar to that car. One witness noticed that one of the brake lights was out, and defendant's Yukon had a broken taillight when it was impounded a few days later. Another witness identified the vehicle as defendant's Yukon on the night of the shooting. That witness also thought defendant was in the driver's seat at the time. Gunshot residue was found inside defendant's Yukon, indicating it had been used in a recent shooting. Defendant's Yukon also contained numerous indicia indicating that he had been regularly driving the vehicle. Defendant had also been seen driving the Yukon on prior occasions, including less than three months before the shooting, when he was found with a loaded firearm and gang members in the Yukon.

Other evidence indicated defendant was the driver and/or the shooter. A receipt found in defendant's bedroom showed that just a few days before the shooting, defendant had purchased .38 Special ammunition. Additionally, defendant left California shortly after the shooting, indicating a consciousness of guilt. When defendant was subsequently arrested, he had a teardrop tattoo, which he did not have prior to the Minten/Dante A. shooting and which commonly means "that you've killed somebody." The evidence also showed that defendant was a City Hall gang member and that Minten was aware he was a target of City Hall prior to the shooting.

41

Finally, Dante A. identified defendant as the driver and the shooter when Duron showed Dante A. a photograph of defendant within a few months of the shooting. As discussed below, although defendant contends that the evidence of that identification should have been excluded because the identification procedure was suggestive, we conclude that the identification Dante A. made of defendant at that time was reliable and admissible.

The record thus contains very strong evidence that defendant was the driver, if not the actual shooter, and thus that he was liable for the shootings as an aider and abettor, if not as the direct perpetrator. Therefore, as to the substantive offenses, the gang allegations, and the allegations that a principal personally and intentionally discharged a firearm causing great bodily injury or death, it is reasonably probable that had the jury not heard Lopez's statements about defendant's admissions, the jury would have reached the same result. (See *Watson, supra,* 46 Cal.2d at p. 836.) However, because the jury may not have found defendant was the actual shooter if it had not heard evidence of Lopez's statements, it is reasonably probable that the jury would not have returned true findings on the allegations that defendant himself personally and intentionally discharged a firearm causing great bodily injury or death. We will therefore strike those findings. In addition, because "[a]n enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to [section 12022.53, subdivision (e)], unless the person personally used or personally discharged a firearm in the commission of the offense," we will stay the term for the criminal street gang allegation. (§12022.53, subd. (e)(2); see § 186.22, subd. (b)(1).)

## B.     *Admission of Expert Opinion Testimony*

Defendant also contends the trial court should not have permitted the gang experts to opine that the Minten/Dante A. shooting was part of a gang war because those opinions were not " 'rooted in facts shown by the evidence.' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*).) According to defendant, the expert opinions were based on evidence

42

that the experts themselves provided, including speculation about who was responsible for the Lozano shooting and the Guzman murder.

In *Vang,* the California Supreme Court held that a gang expert may be asked hypothetical questions, even if those questions track the evidence in a manner that is only " 'thinly disguised.' " (*Vang, supra,* 52 Cal.4th at p. 1045.) The court specified that the use of hypothetical questions "is subject to an important requirement," however: " 'Such a hypothetical question must be rooted in facts shown by the evidence . . . .' [Citations.]" (*Ibid.*) Thus, a party cannot use hypothetical questions " 'to place before the jury facts divorced from the actual evidence and for which no evidence is ever introduced.' [Citation.]" (*Id*. at p. 1046.)

Here, the hypothetical questions asked of the gang experts did not run afoul of *Vang*. *Vang* does not state that the evidence referred to in a hypothetical question may not be provided by the gang experts themselves, only that the evidence must come from the case at hand, "not some other case." (*Vang, supra,* 52 Cal.4th at p. 1046.) Moreover, it is not improper for expert opinion testimony to be "premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions," and as long as that material is reliable. (*Gardeley, supra,* 14 Cal.4th at p. 618.) Moreover, Officer Montalbo's opinions were at least partially based on evidence that came directly from witnesses to the Minten/Dante A. shooting, such as the fact that it was a drive-by shooting. Although the experts should not have been permitted to testify about Lopez's statements, and Lopez's statements should not have been included in the hypothetical questions, the expert opinions did not violate the principles in *Vang*.

### C.     *Admission of Dante A.'s Out-of-Court Identification of Defendant*

Defendant contends the trial court erred by admitting evidence of Dante A.'s pretrial identification of defendant based on the newspaper photograph shown to him some time in 2005.

43

### 1. Motion in Limine

Defendant filed a motion in limine to exclude Dante A.'s identification of defendant at a photo lineup in 2009 and to preclude Dante A. from making an in-court identification of defendant. Defendant argued that Dante A.'s pretrial identification was lacking in reliability since it occurred over four years after the homicide and was based on a prior "highly suggestive showing" of a newspaper photograph of defendant. Defendant did not specifically seek to exclude evidence of the identification Dante A. made when he was shown the newspaper photograph.

At a hearing on motions in limine, the trial court initially declined to exclude Dante A.'s pretrial identification of defendant at the 2009 photo lineup. The trial court found that defendant's arguments about reliability went to "the weight to be given to the identification and not its admissibility." The trial court indicated it would also permit Dante A. to make an in-court identification of defendant, but the court ordered that the identification "be done in a manner that would not involve [defendant] being seated next to [defense counsel] at counsel table."

### 2. Evidence Code Section 402 Hearing

During trial, the parties again discussed the issue of whether Dante A. should be permitted to identify defendant in court. At a subsequent Evidence Code section 402 hearing, Dante A. testified that he had selected defendant's photograph at a photo lineup in September of 2009. Dante A. had seen a photograph of defendant two times before, both within a few weeks of the shooting.

First, following the shooting, Dante A. had described the driver to "the people that [he] felt safe with." He told those people that the driver was a male aged 30 or younger, with a round face and thick eyebrows or tattoos over his eyebrows. Those people brought him a photo, which showed defendant in a red shirt. Dante A. recognized defendant as the driver.

44

The second photo of defendant was shown to Dante A. by Duron. The photo came from the newspaper and showed only defendant's face.

When he saw the photo lineup in September of 2009, Dante A. selected defendant because he remembered the driver's face: "His tattoos, his eyes, the structure." Although he claimed his identification was based on his memory of the shooting, Dante A. admitted that "it helped" to have seen the prior photos. Dante A. also admitted he had not initially told the police about seeing defendant's tattoos, explaining that he had withheld information because he was "still worried" about his safety.

Following Dante A.'s testimony at the Evidence Code section 402 hearing, the trial court ruled that the identification process had been "so suggestive" that it was "inherently unreliable," and that therefore the prosecution could not elicit information about the 2009 photo lineup. The trial court indicated it would hold a further hearing prior to allowing Dante A. to make an in-court identification of defendant.

### 3. Dante A.'s Trial Testimony

At trial, Dante A. testified that a few days after the shooting, someone brought him a color photo of a person in a red shirt. Some time after that, Duron showed him a photo of defendant from the newspaper. Duron asked "if this is what he looks like, if this could be him." Dante A. told her, "That's what he looks like. It's dead on." "[I]t was basically looking at the driver for the second time." The photo from the newspaper was different than the photo of defendant in the lineup he had seen right after the shooting. The newspaper photo seemed more recent, and it showed more of defendant's body. In the photo lineup he had seen right after the shooting, defendant appeared heavier and had lighter skin and different facial hair.

After the above testimony, the trial court ruled that Dante A. could not make an in-court identification of defendant. The court found that Dante A. did not have an independent memory of the driver's face; any memory was the product of the photographs he had been shown after the incident.

45

#### 4. The Parties' Contentions

Defendant concedes that he has no cognizable claim under the federal Constitution with respect to the identification he made after Duron showed him defendant's photograph. As defendant notes, the United States Supreme Court recently held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." (*Perry v. New Hampshire* (2012) 565 U.S. ___ [132 S.Ct. 716, 730] (*Perry*).)

Defendant contends that the trial court should have excluded Dante A.'s identification of defendant from the newspaper photograph based on "general evidentiary principles including Evidence Code section 352." He contends the identification lacked probative value because it resulted from a suggestive procedure rendering it unreliable. Defendant acknowledges that his trial counsel did not object to the identification below on the basis of Evidence Code section 352, and he contends that trial counsel was therefore ineffective.

The Attorney General contends that an objection based upon Evidence Code section 352 "would have failed." The Attorney General argues that the evidence was probative, in that it was "highly relevant to the issue of identity" and "not the result of a suggestive identification procedure," while not being unduly prejudicial, because it did not evoke a uniquely emotional bias against defendant.

#### 5. Analysis

Below, defendant successfully objected to the admission of evidence that Dante A. identified defendant at a 2009 photo lineup, and he successful precluded Dante A. from identifying defendant in court. Defendant did not, however, challenge the admission of Dante A.'s identification of defendant in the 2005 newspaper shown to him by Duron. We will therefore address defendant's claim through his argument that trial counsel was ineffective.

46

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] . . . If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966; see *Strickland v. Washington* (1984) 466 U.S. 668.)

Defendant acknowledges that there is no California case addressing the issue of whether the trial court may—or should—exclude evidence of a suggestive pretrial identification that is made without law enforcement participation. He contends there is a "growing trend" in other state courts "to find that privately conducted suggestive identifications, such as the one allowed here, are subject to exclusion under the general legal principle that unreliable evidence should not be admitted at trial."

As the Attorney General points out, all of the out-of-state cases defendant cites predated *Perry, supra,* 565 U.S. ___ [132 S.Ct. 716], including *State v. Chen* (2011) 208 N.J. 307, upon which defendant primarily relies. To the extent those cases rest on independent state grounds, they are not binding authority in California. Defendant's trial counsel was not required to make an objection supported by no California case. (See *People v. Jones* (1979) 96 Cal.App.3d 820, 827.)

In any event, it is not reasonably probable that an Evidence Code section 352 objection to Dante A.'s identification of defendant based on the newspaper photograph

would have been successful. The identification process was not so suggestive as to render it inherently unreliable and therefore lacking in probative value.

"To begin with, '[t]he "single person showup" is not inherently unfair.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 413, fn. omitted.) An identification based on a single person showup may be admissible as long as the person viewing the suspect was not told " 'in any way that [he or] she had to make an identification of the suspects.' " (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 39.) Here, Duron did not tell Dante A. that he had to identify defendant. Rather, she asked, "if this is what he looks like, if this *could* be him." (Italics added.) Moreover, it is unclear whether or not Dante A. read the article, which in any event only identified defendant as a "fugitive" and said that the police wanted to talk to defendant about the Minten homicide.

Even a suggestive identification may "nevertheless [be] reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

The above factors all tend to show that Dante A.'s identification of defendant from the newspaper photograph was reliable, despite any inherent suggestiveness in the identification procedure. First, Dante A. had a good opportunity to see the driver at the time of the incident, and he testified that he was paying close attention. Dante A. testified that he specifically watched the Yukon because he got a weird feeling, that he could clearly see the driver of the Yukon, that the Yukon was traveling slowly, and that the driver looked straight at him. Second, Dante A. had described the driver in some detail prior to seeing defendant's photograph in the newspaper. Dante A.'s description included the fact that the driver had thick eyebrows or tattoos over his eyebrows—a detail

48

that turned out to be accurate. Third, when Dante A. was shown the newspaper photograph of defendant, he was very certain that defendant was the driver: he testified that the photograph was "dead on." Fourth, Dante A. made the identification within a relatively short time after the shooting: Dante A. testified that he had seen the newspaper photograph just a few weeks after the May 13, 2005 shooting, although the photograph apparently did not appear in the newspaper until August 17, 2005.

Finally, Dante A.'s identification of defendant in the newspaper photograph did not "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, subd. (b).) Nothing about the identification tended "to create an emotional bias against" defendant. (*Lucas, supra,* 60 Cal.4th at p. 268.) The trial court could reasonably determine that defendant's claim that the identification was unreliable went to its weight rather than its admissibility. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587.)

In sum, because an objection to Dante A.'s identification of defendant in the newspaper photograph based on Evidence Code section 352 would not have had merit, trial counsel was not ineffective for failing to raise such an objection.

### D. *Denial of Mistrial Motion*

Defendant contends the trial court erred by denying his motion for a mistrial, which he brought after the jury viewed a video depicting Minten's dead body.

#### 1. Motion in Limine

Defendant filed a motion in limine to exclude "inflammatory" photographs and videos of the crime scene and Minten's autopsy. He requested the trial court conduct an Evidence Code section 402 hearing and an analysis under Evidence Code section 352 prior to admitting any such images.

During the April 30, 2012 hearing on motions in limine, the prosecutor represented that he had one video of the crime scene, which was "not of a graphic nature other than the fact that there's a dead person on the ground." The prosecutor did not

49

recall any "close-ups" in the video, and he was not sure whether he would play the video at trial. Regarding the autopsy photographs, the prosecutor argued that they were relevant because the bullet wounds showed that Minten moved in between the two gunshots.

The trial court indicated that a minimum number of crime scene photographs could be admitted to show how the victims were positioned and that the prosecutor could introduce one photograph of each bullet wound. The trial court directed the parties to meet and confer regarding which photographs would be used.

### 2. Trial Proceedings

During the testimony of Officer Nakamoto, the prosecutor sought to introduce photographs of Minten's body at the scene of the shooting. Defense counsel objected to the photographs, describing them as "unnecessarily grotesque." The prosecutor argued that the photographs were relevant because they showed that Minten had been wearing a red shirt before the paramedics ripped off his clothing and argued they were not "unnecessarily graphic." The trial court admitted the photographs.

After the photographs were introduced, the prosecutor asked Officer Nakamoto about the distance between Minten's body and Dante A.'s location. Officer Nakamoto testified that the two victims were 12 to 13 feet apart. The prosecutor then indicated that he would play a video taken the evening of the shooting. Defense counsel initially indicated he had no objection to the video.

However, as the video began playing, defense counsel objected. Defense counsel asserted that it was not the video he expected. The prosecutor acknowledged there were two different videos and apologized "if there's some misunderstanding." He thought that defense counsel had seen both videos.

Defense counsel objected to the video as "unnecessary graphics [*sic*] and prejudicial." The trial court asked if the video continued to depict the victims or if it only depicted the scene. The prosecutor responded, "That's it. That's the extent of it." The

trial court then overruled the objection and permitted the prosecutor to "proceed with the remainder of the video." Apparently, instead of starting from where it had been stopped, the video then replayed from the beginning, showing Minten again.

### 3. Mistrial Motion

Defense counsel later filed a motion for a mistrial. At the next court hearing, he argued for a mistrial, reminding the trial court of its ruling on his motion in limine. Defense counsel explained that pursuant to the trial court's meet-and-confer requirement, he had agreed the jury could be shown two autopsy photographs and a video taken by Officer Barrett. The video shown by the prosecutor was different, and it contained a close-up image of Minten with blood on his face and underneath him. Trial counsel described the image as "shocking" and asserted that the video had no probative value. Trial counsel indicated that an admonition might be adequate to cure the harm, but he advocated for a mistrial because the prosecution had violated the trial court's prior ruling.

The prosecutor argued that there had been a "misunderstanding," not an intentional violation of the trial court's ruling. He had been mistaken about what was on the video, and he would not have played the video if he had remembered that it contained a close-up image of Minten. He argued that the video was probative because it showed the position of the two bodies, thus helping the jury determine whether the driver had the opportunity to shoot both victims.

In response, defense counsel argued that the video had no relevance to the issue of whether the driver could have shot both victims. He pointed out that both victims moved after they were shot.

The trial court denied the motion for a mistrial. It found that the prosecutor did violate the court's ruling, but that the violation was inadvertent. The trial court further found that the video was not so prejudicial as to warrant a mistrial. The court indicated it would give the jury an admonition, and it requested the defense craft one.

51

Both the defense and prosecution ultimately crafted admonitions, and the trial court decided to read the prosecution's admonition to the jury. It provided: "So yesterday, . . . during Officer Nakamoto's testimony the prosecutor played a video recording for you of the nighttime view -- it was represented as being the crime scene -- the video was very graphic and although I had ruled that the People could play the video, upon further review the video was very graphic and should not have been shown to you. Nevertheless, having viewed the video you are entitled to consider it for whatever probative value, if any, whatever bearing upon any issue in this case you think it has and give it the weight to which you feel it is entitled, however, you may not permit the video to create a bias against the defendant, cause you to harbor any prejudice against him or to inflame your passions in any way. You must not be influenced by passion, prejudice or bias for or against any party. Remember you are objective judges of the facts. So I apologize for allowing that video to be shown to you."

### 4. The Parties' Contentions

Defendant contends the video was so irrelevant and inflammatory as to warrant a mistrial. The Attorney General contends that the video merely showed the jury what it had already seen, and that the trial court's admonition was sufficient to cure any prejudice.

### 5. Analysis

"To require the grant of a mistrial motion, the risk of prejudice must be incurable by admonition or instruction. [Citation.] Because the trial court is generally better able than an appellate court to make this determination, a ruling denying a motion for mistrial is reviewed under the deferential abuse of discretion standard. [Citations.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 575.)

We find no abuse of discretion here. We have reviewed the video, which depicts Minten's shirtless, bloody, dead body for approximately 10 seconds. When the jury saw the video, it had already seen other photographs of Minten's dead body. While

52

"unpleasant," nothing about the video was particularly gruesome or inflammatory. (*People v. Hart* (1999) 20 Cal.4th 546, 616.) And while the video was possibly cumulative and therefore subject to exclusion pursuant to Evidence Code section 352, it was not irrelevant. (See *People v. Scheid* (1997) 16 Cal.4th 1, 15 [photograph showing victim's "bloodied, lifeless body was relevant to establish that a murder had occurred"].) The trial court was well within its discretion in determining that the jury's two brief exposures to the video were curable by an admonition, such that a mistrial was not necessary.

## IV.    DISPOSITION

The judgment is modified to strike the jury's findings that defendant personally and intentionally discharged a firearm that caused great bodily injury or death. This modification does not affect the jury's findings that a principal personally and intentionally discharged a firearm that caused great bodily injury or death (§ 12022.53, subds. (d), (e)(1)). The judgment is further modified to stay the term imposed for the criminal street gang allegation (§ 186.22, subd. (b)(1)). As modified, the judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:


_____
ELIA, ACTING P.J.




_____
MIHARA, J.